UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

——————————————————————————

FRIENDS OF MERRYMEETING BAY
and ENVIRONMENT MAINE,

               Plaintiffs,                       C.A. No.

     v.

UNITED STATES DEPARTMENT OF COMMERCE
and NATIONAL MARINE FISHERIES SERVICE,

               Defendants.

——————————————————————————

**VERIFIED COMPLAINT FOR DECLARATORY
<u>AND INJUNCTIVE RELIEF</u>**

I.       <u>INTRODUCTION</u>

1.  Under Section 7 of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. § 1536, a federal agency may not authorize an activity that may affect an endangered species without first undergoing a process known as "formal consultation" with the Secretary of Commerce (who has delegated his responsibilities to Defendant National Marine Fisheries Service ["NMFS"]) or the Secretary of Interior (who has delegated his responsibilities to the United States Fish and Wildlife Service ["USFWS"]) (collectively, NMFS and USFWS are the "Services").  The purpose of such consultation is to ensure that the activity is not likely to jeopardize the species or destroy or adversely modify the species' habitat.  The Services' obligations in the formal consultation process are extensive, and include both a rigorous scientific review of the potential effects of the proposed activity and the imposition of such conditions on the activity as are necessary to avoid jeopardizing the species.  Consultation may also result in a determination that

the activity is so harmful to the species that it must not occur at all.  Among other things, formal consultation results in a "biological opinion" written by the Services.

2.  This case involves NMFS's decision to allow a major federal action – authorization of a dam reconstruction project – to proceed without first evaluating it under the required formal consultation procedures of Section 7, despite the fact that the project will adversely affect endangered Atlantic salmon.  The Worumbo hydroelectric dam ("Worumbo"), which is owned and operated by Miller Hydro Group ("Miller"), is located on the Androscoggin River between the towns of Lisbon and Durham, Maine, in critical habitat for endangered Atlantic salmon.  In listing Androscoggin River salmon as endangered under the ESA, NMFS noted that dams are a direct and significant threat both to the survival and to the recovery of Atlantic salmon.  74 Fed. Reg. 29,344, 29,362, 29,366-67 (June 19, 2009).

3.  Miller wants to replace the 520-foot-long "timber crib" portion of the dam, a part of the dam that is over 100 years old.  Exhibit 1 (May 4, 2011, FERC letter to NMFS; the copy attached here was obtained from NMFS by Friends of Merrymeeting Bay member Douglas Watts).  A timber crib is a structure made of timbers, log-cabin style.  The interior is filled by stone and capped (in this case) with concrete.  This structure impounds water above the natural elevation it would otherwise occupy.  Water spills over the timber crib or through adjacent steel gates in another portion of the dam when the river flow exceeds the hydraulic capacity of the dam's turbines.  Devices installed atop the crib structure offer additional ability to variably adjust the impoundment height or hydraulic capacity.

4.  In Miller's words, the "Worumbo crib dam has reached the end of its useful life." Exhibit 1 (April 29, 2011, Miller letter to FERC, attached to the May 4, 2011, letter).  As described by Miller, "[t]he plan is to build a new dam just downstream from the current dam."

2

Exhibit 4 (July 26, 2010, Miller letter to FERC, p. 6; the copy attached here was obtained from the online FERC docket for Worumbo).

5. Miller operates Worumbo under a federal license issued by the Federal Energy Regulatory Commission ("FERC"), and replacement of the timber crib portion of the dam may not be undertaken without authorization from FERC, which constitutes federal action for purposes of the ESA. NMFS and FERC acknowledge that formal consultation is required for such authorization. Exhibit 1 (FERC request for formal consultation); Exhibit 10 (NMFS email to FERC stating that a biological opinion will be issued; the copy attached here was obtained from NMFS by Mr. Watts). NMFS, however, has invoked a regulation issued by the Services, 50 C.F.R. § 402.05, governing rare "emergency circumstances." This regulation, when applicable, allows agencies to forego extensive, before-the-fact formal consultation and to instead merely confer with the Services on an expedited basis prior to undertaking the federal action under consideration. Under this regulation, formal consultation occurs only after the fact, but "shall be initiated as soon as practicable after the emergency is under control." 50 C.F.R. § 402.05(b). 50 C.F.R. § 402.05(a) specifies that the circumstances which NMFS may treat as an emergency are limited to "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." As one court stated, an emergency under 50 C.F.R. § 402.05 requires the "element of surprise and unexpectedness." Washington Toxics Coalition v. United States Dep't of Interior, 457 F. Supp. 2d 1158, 1195 (W.D. Wash. 2006). Floods, earthquakes, storms, and fires, for example, may create such emergency situations.

6. Here, there has been no flood, earthquake, hurricane, terrorist attack, or other unexpected circumstance that might qualify as an "emergency" under this regulation. Rather, this is the planned maintenance of an asset that has taken over a century to deteriorate, and is in

that sense the *antithesis* of the type of situation that qualifies as an "emergency" under 50 C.F.R. § 402.05.

7.    Moreover, there is no demonstrated threat to public safety.  The public has not been warned to stay clear of the Androscoggin River downriver of Worumbo, and as of the last week of June people were fishing directly below the dam in the Lisbon Falls Fishing Park (see photographs attached as Exhibits 5 and 6).  In fact, by its owner's own account, Worumbo is a "low hazard" dam, which, as defined by regulation, means that *even if the dam were to fail there would be no expected loss of life and only minimal economic loss.*  33 C.F.R. § 222.6, Appendix D § 2.1.2.  Similarly, for decades Miller has been exempt from having to prepare an Emergency Action Plan ("EAP") for Worumbo because FERC has determined that the dam satisfies the criterion that *"no reasonably foreseeable project emergency would endanger life, health, or property."*  18 C.F.R. § 12.21(a) (emphasis added).  Further, any purported "emergency" posed by the potential failure of the Worumbo crib structure could be brought "under control" by drawing down the water level in the impoundment behind the dam.  Formal consultation could then take place prior to the dam removal and reconstruction project.  To Plaintiffs' knowledge, however, no such draw-down has been ordered or effectuated to date.

8.    And even if it *were* the case that the timber crib portion of the dam must be removed immediately for public safety reasons, the removal of this purportedly deteriorating timber crib structure would bring any asserted emergency "under control" and thereby allow full formal consultation to be conducted, as required, prior to any proposed rebuilding of that portion of the dam.  See 50 U.S.C. § 402.05(b).  Formal consultation at this juncture would be especially critical, as reconstruction of the dam will pose a long-term threat to the survival and recovery of the Androscoggin River Atlantic salmon.

9.  Because formal consultation is required by Section 7 of the ESA, and because no emergency is presented within the meaning of 50 U.S.C. § 402.05, NMFS's decision to forgo before-the-fact formal consultation is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA and its implementing regulations.

## II.    JURISDICTION

10.  Plaintiffs are two conservation groups.  On behalf of their members, they work to protect the endangered Atlantic salmon in the Androscoggin River and elsewhere in Maine, including efforts to secure improved fish passage at Worumbo.  They seek to halt the rebuilding of the Worumbo dam in the absence of full formal ESA consultation because the dam harms salmon and is an impediment to the species' recovery, and replacement of the dam along lines similar to its current configuration and operating specifications will perpetuate that harm.  Under the Administrative Procedure Act ("APA"), they challenge, as being arbitrary, capricious, an abuse of discretion, and not in accordance with law, the determination by NMFS that the condition of the Worumbo timber crib structure presents an "emergency" situation under 50 C.F.R. § 402.05, and the determination by NMFS that the removal and replacement of that structure may proceed before completion of the formal consultation procedures required by Section 7 of the ESA.

11.  This action is brought pursuant to the APA, 5 U.S.C. §§ 702-704, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Venue lies in this District pursuant to 28 U.S.C. § 1391(e).

### III.   BACKGROUND ON THE ENDANGERED ANDROSCOGGIN RIVER POPULATION OF ATLANTIC SALMON

12.  Historically, the Androscoggin had, along with the Kennebec River, the largest Atlantic salmon runs in the United States, estimated at more than 100,000.  Now, according to recent annual surveys done by the Maine Atlantic Salmon Commission, the number of adult Atlantic salmon returning to the Androscoggin River each year is dangerously low.  In 2011, 46 adult salmon returned to the Androscoggin (*see* Maine Atlantic Salmon Commission adult salmon return numbers, available at http://www.maine.gov/asc/research/trap_count_stats.shtml).

13.  On June 19, 2009, the Services issued a final rule designating the Androscoggin River population of Atlantic salmon as "endangered" under the ESA because it is in danger of extinction.  74 Fed. Reg. 29,344 (June 19, 2009); 16 U.S.C.§ 1532(6) (definition of "endangered").  On that same day, the Services issued a final rule designating "critical habitat" for the Androscoggin – *i.e*., habitat "essential to the conservation of the species" and "which may require special management considerations or protection."  16 U.S.C. § 1532(5)(A)(i).  The portion of the Androscoggin River where Worumbo dam is located and those portions affected by the dam are part of that critical habitat.  74 Fed. Reg. at 29,300.

14.  In their decision to include the Androscoggin River population of Atlantic salmon on the Endangered Species List, the Services found that dams on that river play a major role in imperiling the salmon.  The Services stated:  "The National Research Council stated in 2004 that the greatest impediment to self-sustaining Atlantic salmon populations in Maine is obstructed fish passage and degraded habitat caused by dams …  Dams are known to typically kill or injure between 10 and 30 percent of all fish entrained at turbines [cite omitted].  With rivers containing multiple hydropower dams, these cumulative losses could compromise entire year classes of

Atlantic salmon …  Thus, cumulative losses at passage facilities can be significant …   Dams remain a direct and significant threat to Atlantic salmon."  74 Fed. Reg. at 29,362.  Similarly, the Services stated:  "Dams are among the leading causes of both historical declines and contemporary low abundance of the GOM DPS [Gulf of Maine Distinct Population Segment] of Atlantic salmon [cite omitted]."  The Services also stated that the "effects [of dams] have led to a situation where salmon abundance and distribution has been greatly reduced, and thus the species is more vulnerable to extinction …  Therefore, dams represent a significant threat to the survival and recovery of the GOM DPS."  74 Fed. Reg. at 29,366-67.

15.  Among the ways Worumbo dam harms salmon are the following:

a.  The dam's turbines kill and injure out-migrating salmon when the salmon attempt to pass through them.

b.  The dam severely limits upstream passage of salmon, preventing access to significant amounts of spawning and rearing habitat.

c.  Facilities meant to allow the salmon to pass around or through the dam cause delays in passage, resulting in incremental losses of salmon smolts, pre-spawn adults, and adults.

d.  The dam is a barrier to the migration of other fish whose presence is necessary for the salmon to complete their life cycle.

e.  The dam adversely alters predator-prey assemblages, and reduces the ability of the salmon to detect and avoid predators.

f.  The dam creates slow-moving impoundments in formerly free-flowing reaches.  These altered habitats are less suitable for spawning and rearing of salmon and contribute to the dam's significant impairment of essential behavior patterns of the salmon. In addition, these conditions may favor non-native competitors at the expense of the native salmon.

g.  The dam results in adverse hydrological changes, adverse changes to stream and river beds, interruption of natural sediment and debris transport, and changes in water temperature, all of which contribute to the dam's significant impairment of essential behavior patterns.

Id. at 29,352, 29,362, 29,366-67, 29,370-71.

## IV.   LEGAL BACKGROUND

### A.   The ESA Consultation Framework

16.  Under the ESA, the Secretaries of Interior and Commerce are charged with listing species as endangered or threatened.  16 U.S.C. §§ 1532(15), 1533.  The Secretary of Interior, acting through USFWS, is responsible for terrestrial and fresh water species, and the Secretary of Commerce, acting through Defendant NMFS, is responsible for marine species, including anadromous fish, such as salmon.  16 U.S.C. §§ 1532(15), 1533.  With respect to Androscoggin River dams, NMFS is the lead agency implementing the ESA.  NMFS is a division of Defendant Department of Commerce.

17. Section 7 of the ESA is entitled, "Interagency cooperation."  Section 7(a) requires that "each federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical."  16 U.S.C. § 1536(a)(2).

18.  The Act establishes an interagency consultation process to assist federal agencies in complying with their substantive Section 7(a)(2) duty to guard against jeopardy to listed species or destruction or adverse modification of critical habitat.  Under Section 7(a)(2), federal agencies

must consult with the appropriate expert fish and wildlife agency to determine whether their

actions are likely to jeopardize listed species' survival or adversely modify designated critical

habitat and, if so, to identify ways to modify the action to avoid that result.  16 U.S.C. §

1536(a)(2); 50 C.F.R. § 402.14.

     19.  ESA regulations jointly promulgated by the Services distinguish between two types

of consultation:  informal and formal.  If the action agency determines that an action is "not

likely to adversely affect" listed species or critical habitat *and* if the pertinent Service concurs in

writing in that determination, no formal consultation is required.  The process of arriving at the

"not likely to adversely affect" determination and obtaining the Service's concurrence is called

informal consultation.  During informal consultation, the Services may suggest modification to

the action that will avoid the "likelihood of adverse effects to listed species or critical habitat."

50 C.F.R. § 402.13.  Informal consultation does not conclude until the pertinent Service issues its

written concurrence, and only then may the consultation be resolved without preparation of a

biological opinion.  If the Service does not concur, or if the action agency has determined that

the action is "likely to adversely affect" the listed species, the agencies must conduct a formal

consultation.

     20.  Formal consultation is initiated upon written request from an action agency and

culminates with one of the Services issuing a biological opinion.  50 C.F.R. § 402.02 (definition

of "formal consultation").  The request to initiate formal consultation must include the action

agency's assessment of the action's impacts on listed species and their habitat, including any

cumulative effects, and must provide all relevant information about such impacts to the expert

fish and wildlife agency.  50 C.F.R. § 402.14(c).

21.  The end product of formal consultation is a biological opinion in which the Service determines whether the action is likely to jeopardize the survival and recovery of listed species or destroy or adversely modify the species' critical habitat.  16 U.S.C. § 1536(b).  In order to make this determination, the Service must review all relevant information and provide a detailed evaluation of the action's effects, including the cumulative effects of other activities in the area, on the listed species and critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).  The Service must use "the best scientific and commercial evidence data available" in formulating its biological opinion.  16 U.S.C. § 1516(a)(2); 50 C.F.R. § 402.14(g)(8).  If the Service determines that the action is likely to jeopardize the species or adversely modify its critical habitat, the biological opinion must specify reasonable and prudent alternatives that will avoid jeopardy.  16 U.S.C. § 1536(b)(3)(a); 50 C.F.R. § 402.14(h)(3).  The Service must also formulate discretionary conservation recommendations to reduce or minimize the action's impacts on listed species or critical habitat.  50 C.F.R. § 402.14(g)(6).

22.  Not only does a Section 7 consultation assist the action agency in discharging its duty to avoid jeopardy and adverse habitat modification, but the biological opinion may also affect the action agency's obligation to avoid a "take" of listed species.  Under ESA Section 9, 16 U.S.C. § 1538(a)(1)(B), it is illegal for any person – whether a private or governmental entity – to "take" any endangered species of fish or wildlife.  "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The Services have defined "harm" to include "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating,

feeding or sheltering." 50 C.F.R. § 222.102 (NMFS definition); <u>accord</u> 50 C.F.R. § 17.3 (similar USFWS definition).

23. As part of a consultation, the Service determines whether to authorize the incidental take of listed species through the issuance of an incidental take statement. An incidental take statement may be issued only if the action can proceed without causing jeopardy. 16 U.S.C. § 1536(b)(4). An incidental take statement must: (1) specify the impact of the incidental take on the listed species; (2) specify reasonable and prudent measures the Service considers necessary to minimize that impact; and (3) set forth mandatory terms and conditions to implement such reasonable and prudent measures. 16 U.S.C. § 1536(b)(4).

24. An incidental take statement insulates the federal agency from liability for a take of an endangered species, provided the agency complies with the statement's terms and conditions. This insulation extends further to any entity receiving a federal permit, license, authorization, or funding subject to, and in compliance with, the statement. Thus, the Act provides that:

> [A]ny taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) of this section shall not be considered to be a prohibited taking of the species concerned.

16 U.S.C. § 1536(o)(2).

B.    <u>Consultation During Emergencies</u>

25. The Services' regulations allow informal consultations during emergency circumstances. 50 C.F.R. § 402.05 provides:

> (a) Where emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures that the Director determines to be consistent with the requirements of sections 7(a)-(d) of the Act. This provision applies to situations involving acts of God, disasters, casualties, national defense or security emergencies, etc.

> (b) Formal consultation shall be initiated as soon as practicable after the emergency is under control. The Federal agency shall submit information on the nature of the

emergency action(s), the justification for the expedited consultation, and the impacts to endangered or threatened species and their habitats.  The Service will evaluate such information and issue a biological opinion including the information and recommendations given during the emergency consultation.

50 C.F.R. § 402.05.  Unlike formal consultation, consultation under 50 C.F.R. § 402.05 does not result in a biological opinion or an incidental take statement before the federal agency conducts its activities; the biological opinion is issued only after the fact.

26.  The court in Washington Toxics Coalition, in construing the meaning of "emergency" in 50 C.F.R. § 402.05, stated:

Although "emergency" was not actually defined, some guidance may be taken from the examples provided.

"Act of God" is defined in the dictionary as "[a]n overwhelming, unpreventable event caused exclusively by forces of nature, such as an earthquake, flood, or tornado." BLACKS LAW DICTIONARY (8th ed. 2004.  It is defined in the *Oxford English Dictionary* as the "action of uncontrollable natural forces in causing an accident, as the burning of a ship by lightning."  "OXFORD ENGLISH DICTIONARY (2d Ed. 1989) ("OED").  *Black's* defines "disaster" as a "a calamity, a catastrophic emergency," while the OED defines it as "[a]nything that befalls of ruinous or distressing nature; a sudden or great misfortune, or misadventure; a calamity."  "Casualty" is defined as "[a] chance occurrence, an accident; *esp.* an unfortunate occurrence, a mishap; now, generally, a fatal or serious accident or event, a disaster," *Oxford English Dictionary*, and "1. A serious or fatal accident.  2. A person or thing injured, lost or destroyed," BLACKS LAW DICTIONARY.

In addition, "emergency" is defined in the dictionary as "a state of things unexpectedly arising, and urgently demanding immediate action."  OXFORD ENGLISH DICTIONARY.

457 F. Supp. 2d at 1195.

27.  The Services' joint "Endangered Species Consultation Handbook" (March 1998), available at http://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf, uses the phrase "natural disaster or other calamity" to describe the situations in which an "emergency" occurs for 50 C.F.R. § 402.05 purposes.  Consultation Handbook § 8.1.

28.  There is a temporal aspect to "emergency" under 50 C.F.R. § 402.05.  The Services, in their response to comments when promulgating 50 C.F.R. § 402.05, characterized the regulation as being applicable to situations involving "severe time constraints inherent in an emergency" and "actions that are immediately required."  52 Fed. Reg. 19,926, 19,938 (June 3, 1986).  The Consultation Handbook states that "[p]redictable events ... do not qualify as emergencies under the Section 7 regulations unless there is significant unexpected human health risk."  Consultation Handbook § 8.1.  Similarly, the Consultation Handbook makes it clear that the need for emergency consultations arises in situations where there is simply no time to undergo formal consultation.  Thus, in an emergency, "a Federal agency may not have the time for the administrative work required by the consultation regulations under non-emergency conditions" (Consultation Handbook § 8.1) and time will be so short that the initial contact with the Service will have to be by telephone or fax (Consultation Handbook § 8.2).

29.  Because before-the-fact "emergency" consultation is so rushed and cursory, and because of the risk that this truncated review will effectively prejudge any formal consultation that ensues, 50 C.F.R. § 402.05 is narrowly drawn and only rarely applicable.  As the court in Forest Service Employees for Envtl. Ethics v. United States Forest Service, 397 F. Supp. 2d 1241, 1256-57 (D. Mont. 2005), stated:  "[T]he emergency consultation provision of 50 C.F.R. § 402.05 is not a substitute for required consultation under 16 U.S.C. § 1536 (a)-(c). … [U]nder the ESA framework, emergency consultation is intended to be the exception, not the rule.  The emergency exception is meant for unexpected exigencies."

V.    FACTUAL BACKGROUND

A.    NMFS Invoked Emergency Consultation Procedures With
      Respect To The Worumbo Timber Crib Project.

30.  Recognizing its obligation to formally consult, FERC wrote to NMFS on May 4,

2011, asking, with respect to FERC's approval of the Worumbo timber crib replacement, for

"formal consultation under the Endangered Species Act (ESA) using the emergency consultation

procedures specified in NMFS's joint regulations [with USFWS] at 50 C.F.R. § 402.05."

Exhibit 1.  That letter states the basis for the emergency consultation request as follows:

> The attached April 29, 2011 letter from the dam owner conveys the sense of urgency for
> replacing the existing timber crib spillway with a concrete gravity structure as soon as
> possible.  The existing 100-year-old-plus timber crib spillway has reached the end of its
> service life, resulting in a significant probability of failure if construction is delayed to
> 2012.  In terms of impact of failure, when dams fail suddenly, effects are often
> unpredictable.  A failure of Worumbo Dam would result in significant environmental
> consequences and could also produce serious public safety consequences and property
> damage.  FERC concurs with the urgency expressed by the owner, and as such, believes
> that the spillway should be replaced during the construction season this summer.

As discussed more fully below, Miller described Worumbo in the referenced April 29, 2011,

letter as a "low hazard" dam.

31.  On May 9, 2011, Jeff Murphy of NMFS sent an email to FERC invoking the

emergency consultation procedures.  That email states, in its entirety:

> We received your letter dated May 4, 2011 concerning the emergency repairs at the
> Worumbo Project (FERC No. 3428), located on the Androscoggin River in Maine.
> Given the emergency nature of the repairs, NMFS can confirm the emergency
> consultation procedures outlined under 50 C.F.R. § 402.05 are appropriate for this
> situation.  We will continue to work with the licensee to minimize environmental impacts
> including those to listed Atlantic salmon during the repairs.  Once construction is
> completed, FERC should submit a biological assessment to NMFS describing the nature
> of the emergency, the justification for the expedited consultation, a description of the
> work, and any impacts to listed Atlantic salmon and designated critical habitat.  Much of
> this information has already been prepared.  NMFS will then evaluate this information to
> issue a Biological Opinion to FERC.
>
> We would appreciate obtaining monthly updates on your work.

14

Exhibit 10.

31a.  It is Plaintiffs' understanding, based on a review of a schedule submitted on behalf of Miller, that the Worumbo timber crib replacement project is scheduled to start any day.

B.    The Record Shows That A Failure Of Worumbo Would Not Cause An "Emergency," And That The Need To Replace The Worumbo Spillway Did Not Arise Suddenly Or Unexpectedly.

1.    Worumbo is a "low hazard structure."

32.  Miller represented to FERC in the previously referenced April 29, 2011 letter that Worumbo dam is "a low hazard structure."  A true and correct copy of this letter that was obtained from NMFS is attached as Exhibit 1 (the April 29, 2011, letter is an enclosure to a May 4, 2011, letter from FERC to NMFS).  A low hazard structure is one that, as defined by Army Corps of Engineers ("ACE") regulations (referenced and relied on by FERC in FERC's dam safety regulations), "will generally be located in rural or agricultural areas where failure may damage farm buildings, limited agricultural lands, or township or country roads."  33 C.F.R. § 222.6, Appendix D § 2.1.2 (ACE hazard potential classifications are referred to by FERC in its regulations at 18 C.F.R. § 12.31(b)).  By contrast, "[s]ignificant hazard potential category structures will be those located in predominantly rural or agricultural areas where failure may damage isolated homes, secondary highways or minor railroads or cause interruption of use or service of relatively important public utilities.  Dams in the high hazard potential category will be those where failure may cause damage to homes, extensive agricultural, industrial and commercial facilities, important public utilities, main highways, or railroads." 50 C.F.R. § 222.6, Appendix D § 2.1.2.  ACE's dam safety regulations contain the following  table summarizing the dam safety classifications:

**TABLE 2 – HAZARD POTENTIAL CLASSIFICATION**

| Category | Loss of Life (extent of development) | Economic loss (extent of development) |
|----------|--------------------------------------|----------------------------------------|
| *Low* | *None expected (No permanent structures for human habitation).* | *Minimal (Undeveloped to occasional structures or agriculture).* |
| Significant | Few (No urban developments and no more than a small number of habitable structures). | Appreciable (Notable agriculture, industry or structures). |
| High | More than a few. | Excessive (Extensive community, industry or agriculture). |

Id. (emphasis added).

2.      Miller demonstrated to FERC that a failure of Worumbo would pose little danger, and therefore received an exemption from having to file an "emergency action plan."

33.  FERC licensees who operate hydroelectric dams ordinarily must develop and file an emergency action plan ("EAP") with FERC.  18 C.F.R. § 12.20(a).  Such plans instruct project personnel as to the actions they are to take during a "project emergency."  A "project emergency" is defined as "an impending or actual sudden release of water at the project caused by a natural disaster, accident, or *failure of project works*."  18 C.F.R. § 12.3(b)(9) (emphasis added).  The EAPs are to include procedures for notifying potentially affected persons and appropriate government officials and procedures for controlling the flow of water.  18 C.F.R. § 12.22(a)(i)-(iii).  An EAP must also include a plan for training dam personnel to respond properly during an emergency, 18 C.F.R. § 12.22(a)(2)(i), and a study showing areas that may be affected by a sudden release of water, 18 C.F.R. § 12.22(a)(2)(ii).

34.  A dam operator may be granted an exemption from filing an EAP if it *"satisfactorily demonstrates that no reasonably foreseeable project emergency would endanger life, health, or*

*property."*  18 C.F.R. § 12.21(a) (emphasis added).  Miller has applied for and received such an exemption from FERC for Worumbo dam.  In a letter dated September 15, 2008, Miller requested a continuation of an exemption from filing an EAP for Worumbo.  Attached as Exhibit 2 is a true and correct copy of this letter, which was downloaded from the FERC docket (available online).  *Miller's letter indicates that the EAP exemption has been in effect for over 25 years.*  The letter, which bears the subject line "Emergency Action Plan Exemption," states:

> On August 22, 1986 Miller Hydro Group (MHG) requested an exemption from further filing of an Emergency Action Plan for the Worumbo Project.  That request was granted by letter dated January 5, 1987.  On August 27, 2008 and August 28, 2008, Worumbo Project personnel conducted an upstream and downstream site reconnaissance by boat.  Based on this visual observation and review of currently available aerial maps (Google Earth internet mapping software), MHG knows of no changes in circumstances, either upstream or downstream, which would revise the hazard potential of this project.  Therefore, MHG requests that the low-hazard status of this project be continued.

35.  Ed Friedman, Chair of Plaintiff Friends of Merrymeeting Bay, has reviewed the online FERC docket for Worumbo and has not found a FERC response to this letter, nor any entries for a Worumbo EAP.  However, he did find an entry for another Worumbo EAP exemption request, dated September 27, 2010, although that letter was not publicly available to be downloaded.  A true and correct copy of the docket entry is attached as Exhibit 3.  Mr. Friedman's review of docket sheets for other dams in Maine indicated that filed EAPs are reflected on FERC's online docket sheets.  Thus, it appears that Miller is still operating under an EAP exemption for Worumbo, which means that FERC continues to hold that a Worumbo dam failure would *not* "endanger life, health, or property."  18 C.F.R. § 12.21(a).

     3.      Less than three months ago, Miller made clear to FERC
            <u>that no emergency conditions would arise if Worumbo failed.</u>

    36.  In its April 29, 2011, letter to FERC regarding the timber crib replacement (Exhibit 1), Miller made clear that a failure of Worumbo dam would not create emergency conditions. Miller made the following statements:

    (a)  When Worumbo was last examined "closely," in 2010, "the condition of the dam was not of failure in progress or imminent failure."  Miller did not know the current condition of the dam, except to surmise that it might be further deteriorated from the previous year.

    (b)  If Worumbo failed "slowly during a high water event," there would be "some impacts to property, but there would probably be limited impact to the environment or persons." Failure of timber crib dams "are normally slow and under high flow conditions."

    (c)  If Worumbo failed in other than high water conditions (if a "sunny day breach" occurred), "[t]here would be a hazard risk to fisherman [sic] or other recreationists in the area downstream of the dam; there would likely be environmental impacts from sediment flows; and there would be property impacts *to the Project* [*i.e.*, to the dam itself]" (emphasis added).

     4.      Miller notified FERC as early as 2009 that it wanted to replace the timber
            crib, and has consistently represented the project as one concerning "planned"
            <u>construction and rehabilitation – with no mention of an "emergency."</u>

    37.  Miller has been in contact with FERC since 2009 regarding the condition of the timber crib portion of Worumbo dam and the need for maintenance, repairs, and replacement. Exhibit 11 (February 3, 2011, email from Miller engineering contractor Chris MacDonald to Army Corps of Engineers; the copy attached here was obtained by Mr. Friedman from Maine Department of Environmental Protection ("DEP"), and the handwritten note and underlining are Mr. Friedman's).  By letter dated July 26, 2010, Miller notified FERC that it wanted to replace the timber crib portion of Worumbo dam.  A true and correct copy of this letter was downloaded

from the online FERC docket for Worumbo, and is attached as Exhibit 4.  In this letter, Miller made no mention of the possibility of dam failure, of any urgency in completing this work (which Miller stated it wanted to schedule for summer 2010 or summer 2011), or of any potential hazards posed by the dam.  The letter indicates that Miller had informed the Maine Department of Marine Resources ("DMR") of its desire to replace the timber crib dam four months earlier, on March 25, 2010.

38.  In its August 13, 2010, Permit By Rule Notification to DEP regarding construction of an access road for the Worumbo dam reconstruction project, Miller repeatedly characterizes the dam project as "ongoing maintenance activities" and "planned construction," and attaches a report based on a wetlands and vernal pools survey Miller conducted in anticipation of the project back in the spring of 2010.  A true and correct copy of the Notification submission, obtained by Mr. Friedman from DEP, is attached as Exhibit 12 (the handwritten marks on p. 3 of Exhibit 12 are Mr. Friedman's).

39.  On January 1, 2011, Miller published a notice of its application for a permit and Water Quality Certification from DEP; the notice makes no mention of an emergency, describing the project as the "rehabilitation" of Worumbo dam.  A true and correct copy of p. C7 of the January 1, 2011, Lewiston *Sun Journal* is attached as Exhibit 13.

     5.    <u>Miller operated Worumbo normally this year.</u>

40.  To Plaintiffs' knowledge, Miller did not draw down the water behind the dam to avert dam failure or to avert any asserted potential emergency that might result from a dam failure.  To Plaintiffs' knowledge, Worumbo has been run with a normal "head" (water pressure behind the dam) during high water this spring and summer.  Attached as Exhibits 14 and 15 are photographs taken by Mr. Friedman from a helicopter above Worumbo dam, on April 19, 2011,

and on July 14, 2011, respectively.  Each of these photographs shows high water behind the dam, water spilling over the timber crib portion of the dam, and little or no water coming through the four vertical slide gates (in the concrete structure).

      6.       On a recent visit to Worumbo, no warnings of
                      <u>possible emergency conditions were observed.</u>

    41.  On June 28, 2011, Mr. Friedman visited the area surrounding Worumbo.  On that visit, Mr. Friedman heard no warning sirens, saw no signs warning of a potential dam break, and observed no other warnings about a potential dam failure.  He found (and photographed) access points for fishermen and other members of the public on either side of the river below the dam; both access points were open and neither was posted with signs indicating any danger from dam failure.  True and correct copies of two of Mr. Friedman's photographs of the access points are attached as Exhibit 5 (photograph of "Lisbon Falls Fishing Park" area, with sign stating "THIS PARK IS OPEN FOR PUBLIC USE", and photograph of footpath to river with signs warning only of generic danger of rapidly rising river water).  Mr. Friedman was able to walk down to the west riverbank directly below the dam, and noticed several people fishing directly below the dam.  Mr. Friedman saw what appeared to be a father and son fishing below Worumbo dam that day, and he took a photograph of them.  A copy of that photograph is attached as Exhibit 6. Attached as Exhibit 7 are other photographs of Worumbo dam Mr. Friedman took on June 28, 2011, which show water pouring over the spillway along the timber crib portion of the dam (*i.e.*, the water behind the dam had not been drawn down).  Attached as Exhibit 8 is an overhead photograph of Worumbo that Mr. Friedman downloaded from Google Earth on July 9, 2011 (the photograph is dated May 17, 2010).  Mr. Friedman annotated the photograph to delineate the timber crib spillway and the areas immediately downstream of Worumbo where there is pubic fishing access.

7.      The only potential "emergency" situation at Worumbo will be created <u>by the dam reconstruction project itself.</u>

42.   In May 2011, Miller prepared a Temporary Construction Emergency Action Plan ("TCEAP") for the timber crib replacement project, as required by FERC, a true copy of which was downloaded from the FERC online docket for Worumbo and is attached as Exhibit 9.  The TCEAP provides "the basis for notification and evacuation of construction workers and other persons who would be affected by a failure of the temporary cofferdam systems constructed to dewater the work areas, or by high river flows."  TCEAP, p. 1.  The nature of any potential emergency situation is expected to be limited to the immediate area of the dam, as follows:

> Failure or overtopping of the cofferdam or the adjacent spillway crest could result in flooding of the adjacent work area. As a low-hazard structure, a failure of the structure would be contained within the riverbank, and minor downstream impacts are anticipated as a result of cofferdam failure or overtopping, except in the immediate vicinity of the dam. The primary safety concern is the exposure of workers and recreationalists downstream of the dewatering cofferdam.

TCEAP, p. 5.  It is clear from the TCEAP that no adverse environmental impacts are anticipated as a result of a failure or overflow of the cofferdam.

C.      Authorizing A Rebuild Of The Worumbo Timber Crib Triggers A Requirement For NMFS To Formally Consult On All Aspects Of Worumbo's Design, <u>Construction, And Operation.</u>

43.   The Worumbo timber crib replacement project triggers formal consultation not just on the demolition and construction project itself, but also on all aspects of Worumbo's design, construction, and operation.  The Services' Consultation Handbook states, "The [Service] biologist should ask whether another activity in question [here, operation of the dam] would occur 'but for' the proposed action under consultation [replacement of the timber crib].  If the answer is 'no,' that the activity in question would not occur but for the proposed action, then the activity is interrelated or interdependent and should be analyzed with the effects of the action."

Consultation Handbook § 4.5(A), p. 4-27. See 50 C.F.R. § 402.02 (definition of "effects of the action") ("Interdependent actions are those that have no independent utility apart from the action under consideration").

44.   Because Worumbo cannot function as a hydroelectric dam without the timber crib portion of the dam that extends across a long cross-section of the river and is therefore necessary to create the impoundment, the dam itself is "interrelated and interdependent" with the reconstruction project.  NMFS must therefore consider the impacts both of the dam and of the reconstruction of a major portion of the dam (*e.g.*, installing temporary cofferdams, adding fill to the river, pouring concrete, modifying the design to minimize impacts on fish migration) on the species and its critical habitat.

D.   Miller Can Abate Any Possible "Emergency" Conditions Simply By Drawing Down The Water Behind The Dam, Which Would Enable Formal Consultation To Proceed On A Non-Emergency Basis.

45.   If Miller and FERC are truly concerned about the consequences of a sudden dam failure, there is an immediate way to eliminate any "emergency" condition and allow formal consultation to proceed prior to initiation of the Worumbo dam replacement project.  Miller can simply open the Worumbo dam's four 23-foot-high by 19.25-foot-wide vertical slide gates and let the river flow through, thereby lowering the water level behind the dam, reducing pressure on the aging crib structure, and removing the possibility of a sudden release of water in the event of a dam failure.  Such a step is already envisioned as a contingency measure in Miller's Temporary Construction Emergency Action Plan.  Exhibit 9, p. 4 ("In the event of a station outage, the gated spillway will be opened to provide additional spillway capacity.").

E.      Even If Need To *Remove* The Timber Crib Structure Constitutes An "Emergency," There Is No Emergency Requiring An Immediate *Rebuild* Of That Portion Of The Dam.

46.  In any event, at such time as the timber crib is taken down, any purported "emergency" created by potential dam failure would then have then been brought "under control":  the risk of a sudden break would no longer exist.  With that portion of the river running closer to its natural course, impacts to salmon would also be mitigated, and the agencies could then conduct formal consultation.   Miller could thereafter rebuild the dam pursuant to the conditions specified by NMFS in its biological opinion if consultation shows that jeopardy to salmon can be averted.

F.      Facts Related To Standing.

47.  Plaintiff Friends of Merrymeeting Bay ("FOMB") is a non-profit Maine corporation with over 400 members.  FOMB is dedicated to preserving the ecological, aesthetic, historical, recreational, and commercial values of Maine's Merrymeeting Bay and its watershed, which includes the Androscoggin River.  FOMB accomplishes its mission through research, advocacy, land conservation, education, and litigation.

48.  Plaintiff Environment Maine is a non-profit Maine corporation.  It is a statewide environmental organization that advocates for clean air, clean water, and preservation of Maine's natural resources on behalf of approximately 3,460 citizen members from across the state of Maine.  Among other activities, Environment Maine researches and distributes analytical reports on environmental issues, advocates before legislative and administrative bodies, engages in litigation when necessary, and conducts public education.

49.  Plaintiffs have members who have been very active in efforts to preserve Atlantic salmon in the Androscoggin River and Merrymeeting Bay.  For example, Plaintiffs' members were instrumental in securing the designation of the Androscoggin salmon population as

endangered, have for years advocated before federal and state agencies for better salmon passage at Worumbo and other dams, and regularly monitor the water quality of the Androscoggin River.

50.  Plaintiffs have members who are interested in maintaining the natural biodiversity of the Androscoggin River and its environs.  These persons live near, own property near, recreate on and near, and/or otherwise use or enjoy the Androscoggin River and Merrymeeting Bay. Plaintiffs have members who, among other activities, kayak on, canoe on, fish in, walk and hike along, lead guided trips on, and enjoy observing and photographing aquatic life and wildlife in and around the Androscoggin River and Merrymeeting Bay.  Their enjoyment of these activities is impaired by the diminution of the size and health of the Atlantic salmon population in the Androscoggin River.  Ed Friedman is a member of both Plaintiff organizations to whom the allegations of this paragraph apply.

51. Plaintiffs' members enjoy and in many ways receive great value from the presence of wild Atlantic salmon in the Androscoggin River.  They want the wild salmon in the Androscoggin River to be as plentiful as possible, and they want the Androscoggin River population of salmon to eventually recover to the point of no longer being endangered.  The dearth of Atlantic salmon in the river diminishes Plaintiffs' members' use and enjoyment of the river.  If Atlantic salmon were populous enough in the Androscoggin River, Plaintiffs' members could fish for and eat that salmon.  They cannot do so now because the fish are endangered. Recovery of Atlantic salmon in the river would increase economic opportunities for Plaintiffs' members because there would be a greater demand for guided trips that they could lead for paddling, fishing, fish-spotting, or photography, and for other purposes.  Ed Friedman is a member of both Plaintiff organizations to whom the allegations of this paragraph apply.

52.  The improper use of the emergency consultation procedures by NMFS with respect to the Worumbo dam replacement impairs these interests.  Full formal consultation is required *before* the commencement of federal actions potentially affecting endangered species precisely because Congress believed that some of those actions, upon sober reflection, would be determined to be too harmful to proceed.  Here, formal ESA consultation would provide for consideration of many possible changes regarding fish passage and dam design that could enhance the health and well-being of Atlantic salmon in the lower Androscoggin.  Allowing the use of a more cursory consultation process is likely to yield a less considered opinion both as to the true risks to the affected species and as to the alternatives available to reduce or eliminate those risks.  Further, under the plan approved by NMFS, the results of the formal consultation process would not be available to NMFS or FERC until some time *after* the completion of the Worumbo dam replacement project.  At that point, it would be too late for these agencies to seriously consider alternatives to that project (including alternative dam designs) that would reduce or eliminate harm to the Atlantic salmon and its critical habitat.

53.  Disallowing the use of 50 C.F.R. § 402.05 in situations, such as this one, that do not constitute genuine "emergencies," or over a period of time that extends long past the duration of the actual emergency, will ensure better decision-making in circumstances where the proposed action could imperil endangered species.  Here, given the well-documented risks posed to Atlantic salmon and their critical habitat by dams, and the low numbers of Atlantic salmon in the Androscoggin River, there is a clear risk to the environment and to Plaintiffs' members from the failure of NMFS to follow the required formal consultation procedures.  If this Court were to issue a declaratory judgment finding NMFS improperly invoked 40 C.F.R. § 402.05, it is likely that NMFS would dutifully conduct such procedures.

54.  The harm to the endangered Atlantic salmon and its habitat that would be caused by the failure of NMFS to conduct before-the-fact consultation with regard to the removal and reconstruction of Worumbo dam could not be adequately remedied by subsequent action, and would be irreparable.  The concomitant harm that would be caused to the above-mentioned aesthetic and recreational interests of Plaintiffs' members would likewise be irreparable.

VI.     LEGAL CLAIM

55.  Pursuant to Section 706(2)(A) of the APA, 5 U.S.C. § 706(2)(A), the decision by NMFS to invoke emergency consultation procedures is unlawful and must be set aside because it was arbitrary, capricious, and not in accordance with law.

56.  Section 7 of the ESA, by its plain terms, requires formal consultation prior to any removal or replacement of a significant portion of the Worumbo dam.  Moreover, as described in paragraphs 6-8, 30-42, and 44-46, removal and replacement of the Worumbo timber crib structure does not present a "situation[] involving acts of God, disasters, casualties, national defense or security emergencies" or the like, and thus no "emergency circumstances" exist within the meaning of 50 C.F.R. § 402.05.  NMFS did not act in accordance with law in invoking the emergency consultation procedures of that regulation.

57.  The decision to invoke the emergency consultation procedures was arbitrary, capricious, and an abuse of discretion because, as described in paragraphs 6-8, 30-42, and 44-46, the facts in the record do not support (but rather contradict) NMFS's decision that emergency circumstances exist for purposes of 50 C.F.R. § 402.05, and NMFS provided an inadequate explanation of the decision.  Further, NMFS did not consider whether there is a rational connection between the facts in the record and the choice to invoke emergency consultation

procedures, nor did it articulate such a connection.  At bottom, NMFS's decision simply did not "make sense."  Dubois v. United States Dep't of Agric., 102 F.3d 1272, 1285 (1st Cir. 1996).

58.  In the alternative, even if the Court were to determine that the need to remove the timber crib structure presents an "emergency" under 50 U.S.C. § 405.02, its removal would immediately put any such emergency "under control."   Further construction work (on replacement of the timber crib structure) must then, under the terms of that regulation, await the completion of full consultation on a non-emergency basis.  Thus, NMFS's decision to continue to use emergency consultation procedures beyond the time removal of the timber crib structure is accomplished is not in accordance with law.  In addition, invoking the emergency consultation procedures with respect to reconstruction of that portion of the dam is arbitrary, capricious, and an abuse of discretion because there is no information in the record to support a finding that emergency circumstances would continue to exist once the timber crib is removed (indeed, the facts contradict such a finding), and NMFS provided an inadequate explanation of that decision. NMFS did not consider whether there is a rational connection between the facts in the record and the choice to invoke emergency consultation procedures for the dam rebuild, and did not articulate such a connection.

59.  The failure of NMFS to require formal consultation prior to the construction of a new concrete replacement structure to take the place of the timber crib will cause irreparable harm to Plaintiffs.  By acknowledging that formal consultation is required, NMFS and FERC have conceded that the reconstruction project is likely to adversely affect the endangered Atlantic salmon.  Moreover, as reflected in the listing decision, NMFS has determined that dams on the Androscoggin are among the leading causes of both historical declines and contemporary low abundance of Androscoggin River salmon.  By invoking emergency consultation procedures for

Worumbo, NMFS is allowing FERC to authorize the rebuilding of a dam that causes serious harm to salmon without first engaging in the required formal consultation procedures. As the First Circuit has stated, there is a "psychology of decisonmakers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built."  Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir. 1989).  If the timber crib rebuild is allowed to proceed without compliance with the procedural requirements of ESA Section 7, there can be no assurance that a violation of the ESA's *substantive* provisions protecting endangered species will not also result.

WHEREFORE, plaintiffs request that this Court:

(1)  Pursuant to 5 U.S.C. § 706(2)(A), hold unlawful and set aside NMFS's determinations that (a) the removal and replacement of the Worumbo timber crib structure presents an "emergency" situation under 50 C.F.R. § 402.05, and (b) the removal and replacement of the structure may proceed before completion of the formal consultation procedures required by Section 7 of the ESA,  because NMFS acted arbitrarily, capriciously, and contrary to law, and abused its discretion, in making those determinations;

(2)  Issue a declaratory judgment that NMFS's determinations (a) that the removal and replacement of the Worumbo timber crib structure presents an "emergency" situation under 50 C.F.R. § 402.05, and (b) that the removal and replacement of the structure may proceed before completion of the formal consultation procedures required by Section 7 of the ESA, were arbitrary, capricious, not in accordance with law, and an abuse of discretion;

(3)  Issue a preliminary and permanent injunction against NMFS enjoining the agency from invoking emergency consultation procedures with respect to the Worumbo dam reconstruction project;

(4)  In the alternative to prayers for relief (1) – (3):

(a)  Pursuant to 5 U.S.C. § 706(2)(A), hold unlawful and set aside NMFS's determinations (i) that the need to replace the Worumbo timber crib structure once it has been removed presents an "emergency" situation under 50 C.F.R. § 402.05, and (ii) that construction of a new structure to replace the timber crib may proceed before completion of the formal consultation procedures required by Section 7 of the ESA, because NMFS acted arbitrarily, capriciously, and contrary to law, and abused its discretion, in making those determinations;

(b)  Issue a declaratory judgment that NMFS's determinations (i) that the need to replace the Worumbo timber crib structure once it has been removed presents an "emergency" situation under 50 C.F.R. § 402.05, and (ii) that construction of a new structure to replace the timber crib may proceed before completion of the formal consultation procedures required by Section 7 of the ESA, were arbitrary, capricious, not in accordance with law, and an abuse of discretion;

(c)  Issue a preliminary and permanent injunction against NMFS enjoining the agency from invoking emergency consultation procedures with respect to the construction of a new structure to replace the Worumbo dam timber crib, once the timber crib has been removed;

(5)  Award plaintiffs their costs and attorneys' fees in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(6)  Grant such other and further relief as the Court may deem just and proper.

## VERIFICATION

I, Ed Friedman, declare as follows:

1. I am the Chair of Friends of Merrymeeting Bay and a member of Environment Maine.

2. I have personal knowledge of Friends of Merrymeeting Bay and its activities as set forth in paragraphs 47 and 49-51 of the foregoing Verified Complaint.  I also have personal knowledge of the matters set forth in paragraphs 31a, 35, and 37-41 of the foregoing Verified Complaint.  If called upon to testify, I would competently attest to these matters.

I declare under penalty of perjury that the foregoing is true and correct.


Date:  July 15, 2011                          _____/s/_____
                                                            Ed Friedman




Date:  July 15, 2011                          Respectfully submitted,



_____/s/_____              _____/s/_____
David A. Nicholas                             Bruce M. Merrill
20 Whitney Road                               225 Commercial Street, Suite 501
Newton, Massachusetts  02460                  Portland, Maine  04101
(617) 964-1548                                (207) 775-3333
dnicholas@verizon.net                         mainelaw@maine.rr.com

Joshua R. Kratka                              Charles C. Caldart
National Environmental Law Center             National Environmental Law Center
44 Winter Street, 4th Floor                   1402 Third Avenue, Suite 715
Boston, Massachusetts  02108                  Seattle, Washington  98101
(617) 747-4333                                (206) 568-2853
josh.kratka@verizon.net                       cccnelc@aol.com
*(pro hac vice motion to be filed)*           *(pro hoc vice motion to be filed)*


COUNSEL FOR PLAINTIFFS