UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

FRIENDS OF MERRYMEETING BAY, )
et al., )
 )
      Plaintiffs, )
 )  Docket no. 2:11-cv-276-GZS
v. )
 )
UNITED STATES DEPARTMENT )
OF COMMERCE et al., )
 )
      Defendants. )

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiffs' Motion for Preliminary Injunction (Docket # 7), which was filed on July 25, 2011. The Court held a hearing on August 12, 2011 after receiving expedited briefing. For the reasons that follow, the Court now DENIES the Motion for Preliminary Injunction.

**I.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION**

Plaintiffs, as the moving party, bear the burden of persuasion to show: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Iantosca v. Step Plan Servs., Inc., 604 F.3d 24, 29 n.5 (1st Cir. 2010) (citation omitted). Likelihood of success on the merits is the "most important part of the preliminary injunction assessment." Jean v. Mass. State Police, 492 F.3d 24, 27 (1st Cir. 2007). Even if likelihood of success is low, a court might consider injunctive relief based on a very

significant showing of irreparable harm. See Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001) (explaining that the preliminary injunction "process involves engaging in . . . the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position"). However, a showing of irreparable harm must be "grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank Equity Fund II v. Blinds to Go, 370 F.3d 151, 162 (1st Cir. 2004). Ultimately, the Court must "bear constantly in mind that an '[i]njunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case.'" Saco Def. Sys. Div., Maremont Corp. v. Weinberger, 606 F. Supp. 446, 450 (D. Me. 1985) (quoting Plain Dealer Pub. Co. v. Cleveland Typographical Union No. 53, 520 F.2d 1220, 1230 (6th Cir.1975)).

## II.   BACKGROUND

This dispute surrounds a construction project currently underway at the Worumbo Hydropower Project on the Androscoggin River in Lisbon, Maine (the "Worumbo"). The Worumbo is a hydroelectric dam owned and operated by a private company, Miller Hydro Group ("Miller Hydro"), under a Federal Energy Regulatory Commission ("FERC") license issued under the Federal Power Act, 16 U.S.C. § 797(e).[1] FERC's Office of Energy Projects, Division of Dam Safety and Inspections administers FERC's dam safety program and has broad supervisory and inspection authority for all licensed dams. See 18 C.F.R. § 12.4(b).

---

[1] Neither Miller Hydro nor FERC are parties to this current action. Prior to filing this lawsuit, Plaintiffs filed a separate case against Miller Hydro Group, which is currently pending before this Court. (Docket 2:11-cv-00036-GZS.) To date, Plaintiffs have not initiated any legal action against FERC.

The Worumbo is located in the geographic range and designated critical habitat of the Gulf-Of-Maine Distinct Population Segment ("GOM DPS") of Atlantic salmon, a species listed as endangered under the Endangered Species Act ("ESA") by Defendant National Marine Fisheries Service ("NMFS").[2] The final rule listing the GOM DPS Atlantic salmon as "endangered" under the ESA was issued on June 19, 2009. 74 Fed. Reg. 29,344 (June 19, 2009).[3] The GOM DPS includes all anadromous Atlantic salmon whose freshwater range occurs in the watersheds from the Androscoggin River north along the Maine coast to the Dennys River. Id. It also includes all conservation hatchery populations used to supplement these natural populations. Id. The GOM DPS has rarely exceeded 5,000 individuals since 1967. Id.

The record provided to the Court indicates that on April 28, 2011 a teleconference was conducted between a representative from Miller Hydro, FERC staff, and Jeff Murphy, a Fishery Biologist and NMFS staffer, regarding the Worumbo and plans for its more than 100-year-old timber crib spillway.[4] Mr. Murphy is the "NMFS staffer responsible for Atlantic salmon Section 7 consultations with the [FERC]," and was the individual who "consulted informally with the FERC to determine whether formal consultation pursuant to Section 7 of the ESA would be needed for the proposed repairs of the Worumbo … ." (Murphy Decl. ¶3; see also id. at ¶¶1-2 (listing specific title and responsibilities under Section 7(a)(2)).

---

[2] Section 4 of the ESA empowers NMFS to designate species as "threatened" or "endangered" and to designate "critical habitat" for listed species. 16 U.S.C. § 1533 (a)(1), (a)(3); see also 16 U.S.C. §§ 1532(5), (6), (2) (defining critical habitat, endangered and threatened species).

[3] That same day, NMFS and the United States Fish and Wildlife Service ("USFWS") issued a final rule designating "critical" habitat for the Androscoggin, which includes the lower portion of the river where the Worumbo is located. Id.; see also 16 U.S.C. § 1532(5)(A)(i) ("critical habitat" is habitat determined by NMFS and USFWS to be "essential to the conservation of the species" and "which may require special management considerations or protection.").

[4] The Court has no contemporaneous record of this teleconference.

The next day, Miller Hydro sent a letter to Gerald L. Cross, Regional Engineer for FERC's Office of Energy Projects: Division of Dam Safety and Inspections, formally notifying FERC "that Worumbo crib dam has reached the end of its useful life and needs to be replaced now." (Am. Compl. Ex. 1 (Docket # 19-1) at PageID 179 (hereinafter the "Miller Hydro letter").) In this letter, Miller Hydro conceded that it could not predict precisely when, or how, failure would occur, but warned that "it is impossible to guarantee or even provide reasonable assurance that the dam will not fail if construction is delayed to 2012 or beyond." (Id. at 179-80.) As the failure of the dam could present "a hazard risk" to downstream fishermen, recreationists, property and the environment, Miller Hydro wrote that time was of the essence: any such construction project "could only be undertaken during the low water season that normally runs from July through September." (Id. at PageID 179-80.) To this end, Miller Hydro relayed that it had "been in active discussion with [FERC], the Army Corps of Engineers (ACOE), and [NMFS]," and that it was its understanding that "ACOE is only awaiting sign off from NMFS under the ESA to issue the necessary permit." (Id. at PageID 180.) Miller Hydro went on to state that, in accordance with its prior conversations with NMFS, it had already made a number of modifications "to the permanent structure to improve its features for Atlantic salmon" and that it would continue to "work with Maine Department of Marine Resources to provide adequate downstream by-pass flow during the construction period." (Id.)

On May 2, 2011, B. Peter Yarrington, a Fisheries Biologist with FERC, emailed Mr. Murphy to inform him that he is in receipt of the Miller Hydro letter and that "[i]t seems to have the elements discussed in our [teleconference call last week]." (Am. Compl. Ex. 10 (Docket # 19-10) at PageID 222.) Mr. Yarrington went on to ask whether "there is anything specific I need to write in the letter to you, besides that we agree with the licensee's determination, and that we

would like to proceed with emergency consultation?" (Am. Compl. Ex. 10 (Docket # 19-10) at PageID 222.) There is nothing in the record to indicate whether or not Mr. Murphy responded to the specific requests made by Mr. Yarrington in this email.

On May 4, 2011, however, Mr. Cross sent a letter on behalf of FERC to Mr. Murphy, to which he attached the Miller Hydro letter. (See Am. Compl. Ex. 1 (Docket # 19-1) at PageID 177-78 (hereinafter the "FERC letter").) In this letter, Mr. Cross notes that the "April 29, 2011 letter from the dam owner conveys the sense of urgency for replacing the existing timber crib spillway with a concrete gravity structure as soon as possible," and states expressly that "FERC concurs with the urgency expressed by the owner, and as such, believes that the spillway should be replaced during the construction season this summer." (Id. at PageID 177.) Thus, based on its related assessment that "[a] failure of the Worumbo Dam would result in significant environmental consequences and could also produce serious public safety consequences and property damage," FERC was writing this letter to NMFS to "request[] formal consultation under the [ESA] using the emergency consultation procedures specified in NMFS's joint regulations at 50 C.F.R. 402.05." (Id. at PageID 177-78.)[5] The letter goes on to explain that "[e]mergency consultation is warranted for this project because of the dam safety concerns…, and because work needed to remedy these concerns must begin by the low water period of the summer of 2011 which is too soon to complete standard formal consultation under the ESA." (Id. at PageID 178.)

---

[5] Once a species such as the Atlantic salmon is listed and comes under the protection of the ESA, Section 7(a)(2) mandates, in part, that: "Each federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce], insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species … or result in the destruction or adverse modification of [its critical habitat] … ." 16 U.S.C. § 1536(a)(2). If a federal agency determines that its actions "may affect" listed species, it either enters into "formal consultation" with NMFS or engages in "informal consultation" to determine whether formal consultation is necessary. See 50 C.F.R. §§ 402.13; 402.14(a)-(b).

5

In a May 9, 2011 email to Mr. Yarrington, Mr. Murphy accepted FERC's May 4, 2011 request for emergency consultation. Specifically, Mr. Murphy writes: "Given the emergency nature of the repairs, NMFS can confirm that emergency consultation procedures outlined under 50 C.F.R. § 402.05 are appropriate for this situation." (Am. Compl. Ex. 10 at PageID 222.) Mr. Murphy goes on to state that NMFS will "continue to work with [Miller Hydro] to minimize the environmental impacts including those to listed Atlantic salmon during the repairs." (Id.) He also instructs FERC that "[o]nce construction is completed," it "should submit a biological assessment to NMFS describing the nature of the emergency, the justification for the expedited consultation, a description of the work, and any impacts to listed Atlantic salmon and designated critical habitat," which NMFS will then evaluate to issue a Biological Opinion to FERC. (Id.)

On July 12, 2011, FERC's New York Regional Engineer issued a construction authorization order ("FERC Order") to its licensee, Miller Hydro.[6] Pursuant to this FERC Order, Miller Hydro plans to remove a 520-foot long timber crib spillway at the Worumbo and replace it with a new dam just downstream from the current dam. (Am. Compl. Ex. 4 (Docket # 19-4) at PageID 192; Am. Compl. Ex. 9 (Docket #19-9) at PageID 214.) On or about July 15, 2011, Miller Hydro commenced instream repairs on the Worumbo, with monitoring by NMFS. Under the Miller Hydro construction plan, the "mass concrete placement" for the new dam is scheduled

---

[6] The Court takes judicial notice of this July 12, 2011 Construction Authorization, which is publicly available on FERC's website. Letter Order Accepting Miller Hydro's filing of May and June 2011 Pre-Construction Filings re the Worumbo Project Under P-342, (http://elibrary.ferc.gov:0/idmws/file_list.asp?document_id=13940989 (last visited August 17, 2011); see also Defs.' Request for Judicial Notice Ex. 1 (Docket # 22-2) at PageID 318-19.)

to be completed by October 1, 2011 and dam construction is slated to be complete by mid-November.[7] (Am. Compl. Ex. 18 (Docket # 19-18) at PageID 264; Murphy Decl. ¶13.)

The only evidence before the Court regarding the potential impact of the ongoing project to this listed species comes through the testimony and affidavit of Mr. Murphy, whom the Court finds to be credible and qualified. As explained by Mr. Murphy, Atlantic salmon spends most of its adult life in the ocean but returns to freshwater to reproduce. Adults ascend the rivers within the GOM DPS beginning in the spring and continuing through the late fall. Thus, if the instream repair work on the Worumbo occurs in late July through mid-October 2011, the only life stage of salmon that could likely occur near Worumbo are the adults returning to the Androscoggin to spawn in the fall. (Id. ¶17.) The Androscoggin River—where the Worumbo is located—typically accounts for fewer than 1% of annual adult returns. (Id. ¶10.) This year, forty-five adults have returned to the Androscoggin. Id.[8] The record before the Court indicates that there are likely no adults in the project area at this time. (See id. ¶20.)[9]

The potential effects associated with the demolition and subsequent replacement of the Worumbo include inhibiting fish passage during construction, increasing suspended sediment,

---

[7] Notably, the record does not contain any testimony or affidavit by an engineer or other expert on rivers and/or dams. The Court has also not been provided any evidence indicating the current status of the Worumbo construction project and whether or not it remains on schedule.

[8] Over the last decade, only seven wild origin adults have returned to the Androscoggin, and, on average, only eleven total adult fish (wild and hatchery) annually return to this river. (Murphy Decl. ¶10.) While the range for the species is large, the overwhelming majority of adults return to a single river, the Penobscot. 74 Fed. Reg. 29,344 (June 19, 2009). In 2007, 91% of adults returned there. Id. In 2010, 93% of adults returned there. (Murphy Decl. ¶9.)

[9] Mr. Murphy testified that, at the time of the hearing, he did not believe that there are any salmon in the project area. Two radio tagged adult Atlantic salmon, however, have been documented downstream of the Worumbo since late June 2011. These adults had remained within several hundred feet of the dam throughout the construction at the site. However, on Saturday, August 6, 2011, Miller Hydro Group conducted a scuba survey of this area and found that one salmon had regurgitated its radio tag and that the other adult was no longer in the area.

7

causing direct injury and mortality during construction, and potentially spilling toxic substances (e.g., equipment leaks). (Id. ¶16.) The Worumbo upstream fishway has remained operable throughout construction allowing adults to move upstream to spawn. (See Murphy Decl. ¶¶15-19.) The instream repair work has occurred behind cofferdams, which significantly reduces the potential for direct injury or mortality to Atlantic salmon. (Id. at ¶16.)

Miller Hydro has implemented mitigation measures recommended by NMFS to protect Atlantic salmon both during construction and post-construction, including installing sediment curtains, which are impermeable barriers to protect listed salmon by trapping sediment flows, and altering the proposed spillway configuration and rubber dam section to facilitate the safe downstream passage of salmon. (See id. ¶¶14-19.) Miller Hydro has also agreed to use Best Management Practices during construction in an effort to minimize effects to any salmon potentially occurring in the action area, and is coordinating with downstream dam owners to verify that few Atlantic salmon are present in the action area. (Id. at ¶¶14, 16.) In accordance with these Best Practices, starting on July 18, 2011, Miller Hydro has submitted daily monitoring reports to NMFS detailing construction and environmental monitoring efforts at the project, including daily monitoring of sediment levels in an effort to ensure that the effects of sedimentation are low.

As of the date of the hearing, no significant impacts to Atlantic salmon have been reported. Sediment levels have generally remained low during construction, and none of the episodic events of elevated sediment levels have appeared to impact the two Atlantic salmon that were known to be in the action area during construction. Daily reports have also not documented any dead, injured or stranded Atlantic salmon. (Id. at ¶19.)

**III. DISCUSSION**

In this case, Plaintiffs assert that NMFS violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), when it arbitrarily and capriciously agreed to utilize emergency consultation procedures on the Worumbo project pursuant to FERC's request. As explained in Plaintiffs' Motion for Preliminary Injunction, "Plaintiffs do not seek, if a true emergency exists, to prevent the removal of the aging section of the [Worumbo] dam (or taking measures to reduce hydraulic pressure on that section), they do seek an order that will allow for completion of full ESA consultation prior to construction work on any replacement of the dam."[10] (Pls. Mot. (Docket # 7) at 1-2.) Before considering each of the relevant factors, the Court notes that any injunctive relief in this matter would necessarily be limited to actions undertaken and controlled by NMFS, which is the only named defendant in this case. While NMFS has an important role to play in any ESA consultation related to the endangered Atlantic salmon, it does not control the actual construction work on the Worumbo. This work is controlled by Miller Hydro and subject to review and licensing by FERC. Keeping that limitation in mind, the Court proceeds with its consideration of each of the preliminary injunction factors.

**A. Likelihood of Success on the Merits**

In the Court's assessment, there are two issues that prevent the Court finding that Plaintiffs' have the requisite substantial likelihood of success on its claim that NMFS has violated 5 U.S.C. § 706(2)(A). First, Plaintiffs are unlikely to establish that the emergency consultation that has occurred to date qualifies as a "final agency action" by NMFS. Second,

---

[10] In fact, at the hearing, counsel for Plaintiffs represented that the aging section of the Worumbo dam had been removed. While this assertion does not appear to be disputed by Defendants, the Court notes that no evidence was introduced into the record that reflects that the Worumbo cribwork has been completely torn down.

assuming for the moment that the ongoing use of 50 C.F.R. § 402.05 is a final agency action, Plaintiffs are unlikely to establish that NMFS acted arbitrarily and capriciously.

1.  **Final Agency Action**

"The federal courts ordinarily are empowered to review only an agency's *final* action." National Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 659 (2007) (citing 5 U.S.C. § 704). A two-part test is used to determine what constitutes "final agency action" under section 704 of the APA: "[f]irst, [an] action must mark the consummation of the agency's decisionmaking process-it must not be of a merely tentative or interlocutory nature," and "second, [an] action must be one by which rights or obligations have been determined, or from which legal consequences will flow," Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quotation marks and internal citation omitted).

Clear precedent establishes that a biological opinion ("BiOp") represents final agency action by NMFS. See, e.g., Dow Agrosciences LLC v. NMFS, 637 F.3d 259, 261 (4th Cir. 2011). By contrast, Plaintiffs are unlikely to establish that the emergency consultation that has occurred here qualifies as a final agency action by NMFS. The consultation provided by NMFS at this point is "informal" and, by its nature, tentative. 50 C.F.R. § 402.05(a). Likewise, the legal consequences that generally flow from an ESA Section 7 consultation—namely, safe harbor on any takings that might occur—are not yet available. See 16 U.S.C. § 1536(o). On initial review, the Court believes that NMFS' final agency action in the context of the Worumbo will occur when it issues its biological opinion in accordance with 50 C.F.R. § 402.05(b).[11]

---

[11] The Court recognizes that Defendants have moved to dismiss this action based in part on the lack of final agency action. As discussed *infra*, the Court reserves ruling on the motion to dismiss until it is fully briefed. Having agreed to hear Plaintiffs' Motion for Preliminary Injunction on an expedited basis, the Court assumes hypothetical jurisdiction solely for the purpose of deciding the request for preliminary injunction. See Puerto Rico v. United States, 490 F.3d 50, 70 (1st Cir. 2007) (similarly assuming

### 2. Alleged Arbitrary & Capricious Action by NMFS

Looking to the plain language of the ESA, the statute contemplates that the action agency (in this case, FERC) "shall consult with the Secretary" and "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized . . . by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2)&(3). In short, the ESA puts the onus on the action agency to engage in consultation. "[T]he ESA itself does not prescribe how agencies should consult during an emergency, and . . . given this gap, the Services were obliged to fill the gap with rational regulations that themselves comply with ESA section 7." Washington Toxics Coalition v. U.S. Dept. of Interior, Fish and Wildlife Service, 457 F. Supp. 2d 1158, 1195 (W.D. Wash. 2006).

Given the wide discretion afforded to the Secretary under the ESA, the district court in Washington Toxics Coalition found that the "temporal shifting of consultations" that occurs under 50 C.F.R. § 402.05 is consistent with ESA section 7(a)(2). Washington Toxics Coalition, 457 F. Supp. 2d at 1181. The district court went on to state: "[T]here is nothing in ESA section 7(a)(2) that prohibits the mere shifting about of consultations." Id. While 50 C.F.R. § 402.05 plainly applies to emergencies, the Secretary is entitled to significant deference in determining what situations qualify for expedited consultation. The text of Section 402.05 provides NMFS with significant discretion to use emergency consultation procedures in a wide variety of circumstances. While the text of Section 402.05 provides examples of emergencies (none of

---

hypothetical jurisdiction when difficult issues surrounded whether there was a final agency action). Given the current procedural posture of this case, it is "appropriate to bypass" determination of whether there was in fact final agency action by NMFS as well as the applicability of 16 U.S.C. § 825l(b) "and proceed to the more straightforward task" of resolving the preliminary injunction. Id.

which are applicable to Worumbo), the regulation "leaves some room for interpretation in its use of the word 'etc.'" Washington Toxics Coalition, 457 F. Supp. 2d at 1194.

In Washington Toxics Coalition, the district court went on to review the language of the ESA Handbook and concluded that an emergency for purposes of an ESA emergency consultation should include an "element of surprise and unexpectedness." Id. at 1195. "As a result, even though 'emergencies' under the general consultation regulations may include situations which do not necessarily involve the potential loss of human life, but only of property, such 'emergencies' must also be unpredictable or unexpected in some way." Id. Just as it is the responsibility of an action agency to seek consultation, the initial responsibility for determining that an emergency exists and requesting consultation under 50 C.F.R. § 402.05 must rest with the action agency. See also 51 Fed. Reg. 19,926 (June 3, 1986) (noting that under 50 C.F.R. § 402.05 the action agency "must exercise discretion when responding to an emergency as to when to consult with the Service"). Given the time sensitive nature of such requests, it is reasonable to expect that the consulting agency will rely on the representations of the action agency in confirming that emergency consultation is appropriate.[12]

Under this interpretation of 50 C.F.R. § 402.05 and the ESA Handbook, FERC, as the action agency was initially required to determine that the need to replace the Worumbo dam in 2011 was unexpected and that a response was needed before a full ESA consultation could be completed in order to prevent the imminent loss of property. In confirming this determination, it was reasonable for NMFS to rely on the representations in the FERC Letter and the attached Miller Hydro Letter. Thus, NMFS' procedural decision to approve emergency consultation is

---

[12] This is particularly true where the consulting agency has specific expertise that allows it to assess the emergency nature of the required response. In this case, FERC is necessarily better positioned to understand and assess the nature of a failing dam and expecting NMFS to conduct its own an assessment on an expedited basis is plainly unreasonable.

only arbitrary and capricious if these submissions do not support a finding that the need for repair of the Worumbo dam this year was unexpected and that delaying the repair would cause at least a potential loss of property. Applying the "deferential" arbitrary and capricious standard of review, the FERC Letter and Miller Hydro Letter, together, appear to support the necessary findings. National Ass'n of Home Builders, 551 U.S. at 658. As a result, the Court declines to conclude that Plaintiffs have a substantial likelihood of proving that NMFS' decision to proceed with emergency consultation was in violation of the APA.[13]

The heart of Plaintiffs' argument is that full ESA consultation must be completed prior to the construction of a replacement dam. Having fairly acknowledged that dam failure might qualify as an emergency, Plaintiff's argument regarding replacement of the dam actually raises the question of when will the Worumbo "emergency" be "under control"? Under the ESA emergency consultation provisions, FERC is clearly required to initiate formal consultation with NMFS "as soon as practicable after the emergency is under control." 50 C.F.R. § 402.05(b) and ESA Handbook 8.2(b). The regulations clearly do not give NMFS the responsibility or the power to determine when an emergency is "under control."[14] Thus, to the extent Plaintiffs' argument can be more reasonably construed as suggesting that the ESA consultation should switch gears sooner, it would appear that such an argument actually is alleging arbitrary and capricious actions by FERC, which is not a party to this action. See City of Tacoma v. FERC,

---

[13] This preliminary finding does not foreclose the possibility that, after a full administrative record is compiled, this Court might find that other materials provided to NMFS prior to the May 9, 2011 decision confirming the use of emergency consultation procedures provided a basis for disregarding any or all of the representations contained in the FERC Letter and the Miller Hydro Letter.

[14] However, to the extent that the consultation process has begun but not yet been completed, the Court notes that FERC and Miller Hydro appear to be bound by the limitations contained in 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09. Likewise, it appears that absent a BiOp or exemption, Miller Hydro is not entitled to the exemption on takings provided by 16 U.S.C. § 1536(o). These two restrictions should arguably provide ample incentive for FERC and Miller Hydro to complete a formal ESA consultation as soon as practicable.

460 F.3d 53, 76 (D.C. Cir. 2006) ("[T]he ultimate responsibility for compliance with the ESA falls on the action agency").

Having concluded that Plaintiffs do not have the requisite likelihood of success to warrant injunctive relief, the Court briefly considers the remaining preliminary injunction factors, recognizing that the remaining factors are often deemed "matters of idle curiosity" if likelihood of success is not established. New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

**B. Irreparable Harm**

In short, Plaintiffs have not made shown that the endangered Atlantic salmon will suffer irreparable harm absent the injunctive relief they seek against NMFS. See Animal Welfare Institute v. Martin, 623 F.3d 19, 27 (1st Cir. 2010) (noting that a showing of irreparable harm is required in ESA cases). Where, as here, Plaintiffs allege a violation of the procedural requirements of Section 7, the First Circuit makes clear that plaintiffs must "show potential for irreparable harm 'apart from the harm that they argue is inherent in a procedural violation of the ESA's consultation requirement.'" Water Keeper Alliance v. United States Dep't of Def., 271 F.3d 21, 34 (1st Cir. 2001). In the environmental harm context, the First Circuit has rejected the argument that the "death of even a single member of an endangered species" suffices, instead making clear that the alleged imminent harm must rise to the level of injury to the species as a whole. Id.

In this case, the record does not reflect any "concrete showing of probable deaths" arising from the ongoing repair work on the Worumbo. Id. In fact, the record reflects that there are currently very few—if any— Atlantic salmon in the area of the Worumbo dam. (See Murphy Decl. (Docket # 22-1) ¶¶17, 19-20.) Additionally, the Court has received evidence that most

endangered Atlantic salmon currently remain (and appear to favor) areas outside the Androscoggin River.

Likewise, the current record does not establish that the new Worumbo dam specifically will result in the death of Atlantic salmon or negatively impact the species as a whole. Of course, such a record may not exist until after NMFS completes a full ESA consultation on the Worumbo. However, if NMFS determines that the new dam impacts the Atlantic salmon and its critical habitat during the full consultation, NMFS retains the ability to recommend reasonable and prudent alternatives and/or mitigation. Thus, avenues remain open to repair damage that is found later.

Under these circumstances, the record cannot support a finding of irreparable harm.

**C. Balance of the Harms**

In fact, the record shows that granting the preliminary injunctive relief requested by Plaintiffs is just as likely to harm the endangered Atlantic salmon. In the Court's assessment, the emergency consultation being provided by NMFS appears to be providing some amount of protection to the listed species and its critical habitat. If the Court were to grant Plaintiffs the injunction they seek, it would have the perverse effect of preventing NMFS from continuing to consult on steps that might minimize harm to the species.

An injunction that simply restrains NMFS from invoking or applying emergency consultation procedures under 50 C.F.R. § 402.05 in connection with the Worumbo dam project would not prevent FERC or Miller Hydro from moving forward with the project. While Plaintiffs assert that FERC would withdraw its authorization for reconstruction of the Worumbo dam if the Court were to order NMFS to stop emergency consultation, Plaintiffs have provided neither evidence nor precedent that support this assertion.

Ultimately, the balance of the harms weighs in favor of denying an injunction.

**D. Public Interest**

While the Court does not ignore the significant public interest in preserving the endangered Atlantic salmon, there is no evidence in the current record suggesting that the Worumbo project has in fact caused any taking of the species in violation of the ESA.

In the absence of irreparable harm to an endangered species, the public interest is best served by this Court allowing NMFS to continue providing emergency consultation on the Worumbo project. Assuming for the moment that Plaintiffs are correct that a preliminary injunction in this case would, in fact, result in the stoppage of the Worumbo reconstruction, the Court has been provided with no information as to how stopping that work in the waning days of the low water season would impact the Androscoggin River and its use by the public. In short, it is far from clear that the intended ripple effect of the preliminary injunction requested by Plaintiffs would not harm the public. Thus, on the record presented, the Court believes that the public interest is best served by not interfering with a dam project that is literally and figuratively midstream.

**IV. CONCLUSION**

The Court concludes that Plaintiffs have not established a substantial likelihood of success or the necessary irreparable harm. The Court also determines that in this case the balance of the harms and the public interest weigh in favor of not granting the preliminary injunctive relief sought by Plaintiffs. Having given due consideration to all of the relevant factors, the Court hereby DENIES Plaintiffs' Motion for Preliminary Injunction (Docket # 7).

To the extent that Defendants' Response to the Motion the Preliminary Injunction (Docket # 22) included a motion to dismiss based on lack of subject matter jurisdiction, the

Court RESERVES RULING on the motion to dismiss until it can be fully briefed in light of this decision. Therefore, the Clerk is directed to separately docket the Defendant's Motion to Dismiss. On or before September 2, 2011, Plaintiffs shall file a separate response to Defendant's Motion to Dismiss or, alternatively, indicate whether they intend to rely on the responses contained in their Reply (Docket # 25). Defendants may then file a reply memorandum in accordance with District of Maine Local Rule 7(c).

SO ORDERED.

      /s/ George Z. Singal
      United States District Judge

Dated this 17th day of August, 2011.